James E. **FERGUSON** et al.

v.

**FRANCIS I. duPONT & CO.** et al.

No. CA 3–3914–C.

United States District Court,
N. D. Texas,
Dallas Division.

Jan. 25, 1974.

Larry Huelbig and John A. Spinuzzi, Dallas, Tex., for plaintiff.

W. Randolph Elliott, Wynne, Jaffe & Tinsley, Robert L. Trimble, Winstead, McGuire, Sechrest & Trimble, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

The plaintiff Ferguson [1] complains in this suit that the defendant Johnson [2]

1. Ferguson is joined *pro forma* by his wife and by his mother-in-law, each of whom was listed as a co-owner with him of the two accounts with the defendants. No distinction need be drawn, for the purposes of this case, between Ferguson's account with his wife and the one with his mother-in-law.

2. *Johnson was, at the times in question, an employee of Francis I. duPont & Co., later*

succeeded by F. I. duPont, Glore Forgan & Co. (hereafter, "duPont"). The complaint alleges that duPont aided and abetted Johnson by (a) failing properly to supervise and direct his conduct and operations and (b) failing satisfactorily to keep, maintain and supervise its customers' accounts and records.

systematically ignored his orders for the purchase and sale of securities, thereby causing sizable monetary losses. Ferguson says that the defendants' actions violated Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j [b]), Rule 10b(5) of the Securities and Exchange Commission (17 C.F.R. 240.-10b–5), and Section 27.01 of the Business and Commerce Code of Texas, V.T. C.A.

The defendants deny any wrongdoing; on the contrary, they maintain that they handled Ferguson's account properly and in accordance with his instructions.

The Court has reviewed the pleadings and the evidence presented at a trial without a jury. I find it unnecessary to determine whether defendants in fact followed Ferguson's orders. Even if they did not, I find that Ferguson, over a prolonged period, clearly acquiesced in Johnson's handling of his accounts. As will be shown below, Ferguson had stock market experience before opening these accounts and could have been expected to take his business elsewhere had he been truly dissatisfied with Johnson. He traded with Johnson for many months and should not now be heard to complain if when all is said and done he suffered a net loss. Ferguson is not entitled to recover anything from either Johnson or duPont.

Ferguson's complaint itself is the best illustration that he tenaciously kept his account with Johnson despite one alleged error after another. The following account is a paraphrased summary of the complaint's *allegations:*

Ferguson, an attorney, opened his accounts with Johnson (whom he had known for some 15 years) and duPont in June of 1968. In August, only two months later, the first rift developed after Johnson sold 300 shares of Ferguson's Braniff Airways stock without permission. In the same month, Johnson without authorization bought 100 shares of Deltona Corp. stock. (Ferguson admits this transaction caused no loss, and defendants counter that he in fact profited on it.)

In November of 1968, Johnson bought 50 shares of Scottys Home Builders Supply without authorization. (Again, no loss is claimed, and defendants say Ferguson profited.)

In March, 1969, Johnson made an unauthorized short sale of 100 shares of Rockower Brothers, Inc., and three days later bought 100 shares of the same stock at a higher price. The same month, Johnson, ignoring Ferguson's explicit orders, executed a "short" sale of 100 shares of Aileen, Inc., and later covered the sale by repurchasing the stock at a loss. Also in March, Johnson made numerous unauthorized short and margin sales and purchases totaling 550 Ling-Temco-Vought, Inc., warrants. March (apparently a busy month) also brought Johnson's request that Ferguson pay more than $8,000.00, which was "temporarily" needed, but would be refunded when certain errors in Ferguson's accounts were corrected. Ferguson paid the money—which wasn't ever refunded.

May of 1969 brought more trouble to Ferguson. He told Johnson to sell 300 shares of Diversa at $17.50, but Johnson instead sold them for only $14.25. Undaunted, Ferguson ordered Johnson to sell 100 shares of Data Automation, Inc., at $21.00, but Johnson sold at $20.00. Johnson ignored or refused Ferguson's order to sell 100 shares of Rockower Brothers, Inc., and a later order to sell 200 shares after a two-for-one split. Venturing into the realm of commodities futures, Ferguson bought some cocoa contracts after Johnson said the commission would be $385.00. Instead, Ferguson was billed a commission of $1,015.-00. Still in May, Ferguson bought 300 shares of J. I. Case because Johnson tipped that Case was going to pay a five per cent dividend. Not only did the dividend fail to materialize, but Johnson sold the stock at a loss without authority.

Ferguson also accuses the defendants of simply losing all records of 100 shares of the 200 shares of Rockower Brothers that he held. Additionally, Ferguson says, Johnson promised him that his stock would not be sold to pay his bills on his accounts as long as the accounts still contained acknowledged errors. But 1000 shares in four different corporate stocks were sold despite Johnson's promise.

Finally, Ferguson complains that over a period of two years (November 1968 to November 1970), Johnson and duPont systematically defrauded and deceived him in the handling of his accounts.

It is important to note that during the period in question, hardly a business day went by that Ferguson and Johnson weren't in touch, either by telephone or in person. Ferguson's accounts, according to Johnson, were among the most active ones that he handled, and at times were *the* most active. Periodically, confirmations and statements were mailed to Ferguson. In other words, he exercised close supervision over his accounts. Taking his complaints as true, he had numerous opportunities (and provocations) simply to stop doing business with Johnson. For failing to do so, I consider that Ferguson not only acquiesced in what Johnson did, but in effect ratified Johnson's acts.

Ferguson insists that he *did* protest, and that he had good reasons for not withdrawing his business. For example, the evidence indicates that he complained not only to duPont management, but also to the Securities and Exchange Commission regional office in Fort Worth, Texas. Although an SEC investigator talked with both parties, no official action was taken.

Ferguson also has an explanation for continuing to trade with Johnson despite his dissatisfaction: first, he says, duPont held a sizeable portion of his portfolio as security for amounts supposedly owed it; secondly, Ferguson accepted as true Johnson's explanation that the problems were simply the fault of "the girl in the back room" and eventually would be corrected. After he finally realized that his problems were intentionally caused, rather than accidental— some five to seven months after he opened his accounts—he did stop trading with the defendants. I find this unconvincing.

Ferguson's conduct is wholly unlike that of the plaintiff in McCurnin v. Kohlmeyer & Co., 347 F.Supp. 573 (E.D.La.1972), aff'd 477 F.2d 113 (5th Cir. 1973). McCurnin sued his commodities broker and its employee for failing to observe the maximum price he specified when he placed a "buy" order. The trial court (applying Louisiana law) found that McCurnin acted the *same day* he became aware of the unauthorized transaction to register his displeasure. When the defendants erroneously required him to liquidate his position before they would consider making any adjustment, he did so. It appears that the questioned transaction was the *only* one between the parties; unlike Ferguson, McCurnin did not continue to pour money into his account during a declining market in hopes that he somehow would recoup his loss. Unlike Ferguson, McCurnin was entitled to recover damages for the loss occasioned by the defendants' failure to follow his instructions.[3]

Another case in which the plaintiff prevailed, and which Ferguson cites, is Opper v. Hancock Securities Corp., 250 F.Supp. 668 (S.D.N.Y.), aff'd 367 F.2d 157 (2d Cir. 1966). It is true that Opper recovered damages because the defendant brokerage house failed to execute his "sell" order. But it is also true that that case, unlike this one, was (as the trial judge wrote) "a simple, and indeed a flagrant, case of faithless and fraudulent performance by a fiduciary." 250 F.Supp. at 673. That case involved a single order, not a series of transactions. When the plaintiff did not receive a confirmation, he protested. He continued

---

3. For our purposes, it does not matter that *McCurnin* involved the purchase and sale of commodities rather than securities.

to protest frequently and vehemently. He cinched his case by proving that during the time the broker was stalling instead of executing the order to sell, the broker was selling its own holdings of the same stock. Nowhere is there a hint that the plaintiff in that case acquiesced to any degree, certainly not to the degree that Ferguson did.

In some respects, Ferguson's situation is more akin to that of the plaintiff (an elderly widow) in Hecht v. Harris, Upham & Co., 430 F.2d 1202, (9th Cir. 1970). Mrs. Hecht sued her brokerage house and its salesman for fraud, "churning" and self-dealing in their handling of her account during a period of almost seven years. Mrs. Hecht, like Ferguson, was in daily contact with her broker and received periodic confirmations of all transactions in her account. The appellate court agreed with the trial court that Mrs. Hecht was barred by waiver, estoppel and laches from suddenly claiming that the trading in her account was unsuitable to her needs and objectives and *contrary to her instructions*. 430 F.2d at 1208–1209. (She did recover, however, on her claim of "churning", apparently primarily because the court felt that she lacked experience and competence to ·understand that the trading of her account was excessive in terms of frequency and volume. 430 F.2d at 1209–1210.) I cannot find that Ferguson lacked the experience and competence to know what Johnson was doing with his accounts. I believe the words of the Ninth Circuit in another case are appropriate here:

> The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act.

Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 213–214 (9th Cir. 1962).

The Court does not intend completely to absolve the defendants, for their handling of Fergusons' accounts was less than perfect. Nonetheless, defendants correctly argued that even if Ferguson's allegations are taken as true, they show only nonactionable negligence, mismanagement, conversion and violation of an agency obligation; they fall short of demonstrating a violation of the securities acts that would entitle Ferguson to recover damages.

This opinion is submitted in lieu of formal findings of fact and conclusions of law.

Judgment will be entered for the defendants. The Court requests the defendants' attorneys to submit a proposed form of judgment.