Arthur ALTSCHUL and Ida
Altschul, Plaintiffs,

v.

PAINE, WEBBER, JACKSON & CURTIS
INCORPORATED, Defendant and
Third-Party Plaintiff,

v.

Richard J. ALTSCHUL, Third-Party
Defendant.

No. 79 Civ. 2852(MEL).

United States District Court,
S. D. New York.

July 9, 1981.

Norman K. Rosen, New York City, for plaintiffs.

Beekman & Bogue, New York City, for defendant and third-party plaintiff; Martin P. Unger, Richard Fooshee, Eva H. Posman, New York City, of counsel.

LASKER, District Judge.

Arthur and Ida Altschul sue to recover losses sustained in their securities account on the ground of alleged mismanagement on the part of Paine, Webber, Jackson & Curtis Incorporated ("Paine Webber"). The Altschuls claim that the account was churned, unsuitable speculative securities were traded for the account, federal and house margin maintenance requirements were violated, and Paine Webber's conduct constituted common law negligence and fraud.[1] Paine Webber counterclaims for the debit balance of $45,142.38 in the Altschuls' account and for costs and attorneys' fees incurred in defending this action. Paine Webber moves for summary judgment on the complaint and its counterclaims.

I.

The undisputed facts are as follows. Arthur Altschul has been investing in securities for approximately forty years. Until his son Richard became an authorized broker's representative, Arthur Altschul alone decided which securities to purchase and sell. (Altschul Deposition, pp. 10–11). When Richard started working in the brokerage business during the 1960s, Altschul opened an account with him. As Richard's employment changed from one brokerage house to another, Altschul transferred his account accordingly so that Richard could continue to handle the account. (Affidavit of Richard Fooshee, January 23, 1981, ¶ 21, Exs. G and I). In November, 1976, Altschul transferred his account to Paine Webber. When he opened his account, Richard had not yet joined Paine Webber. Altschul at that time executed an "Authorization to Agent or Attorney" authorizing Richard to act on his behalf. (Affidavit of Richard Fooshee, Ex. N). The following month, Richard began working as one of Paine Webber's authorized representatives and Ida's account was also transferred to Paine Webber. Ida's account was closed in December 1977 and a joint account was opened for the Altschuls in June 1978 by transferring all the securities in Arthur Altschul's individual account to the joint account. From December 1976 until the account was liquidated in November 1978, Richard made purchases and sales for the Altschuls' accounts, deposited his own money into the accounts and withdrew money from the accounts, and generally decided on his own which securities to buy and sell for the accounts. (Deposition of Arthur Altschul, pp. 47–48, 53, 61, 76, 87, 93, 127).

This arrangement was successful for a considerable time. Richard's management of the account resulted in an increase in the Altschuls' equity from an initial sum of approximately $30,000. to a high of $497,059. on September 15, 1978. (Affidavit of Richard Fooshee, January 23, 1981, ¶ 33).

1. The Altschuls' federal claims are alleged to arise under 15 U.S.C. § 78j.

In September, 1978, however, the New York Stock Exchange increased its initial margin requirements on certain gambling and leisure stocks, which included a number in the Altschuls' account. (Affidavit of Richard Fooshee, January 23, 1981, ¶ 32 and Ex. Z). The market for many of the securities in the Altschuls' account subsequently declined. Despite the poor market conditions, the Altschuls did not sell these securities. Indeed Richard purchased more of them for the account. Finally, on November 15 and 17, 1978, the Altschuls failed to meet an outstanding maintenance margin call of $88,000. and their account was liquidated, leaving an unsecured balance of $45,142.38.

In his deposition testimony, Arthur Altschul acknowledges that he received and regularly reviewed confirmations and monthly statements for his Paine Webber accounts and that he understood that his account primarily included speculative stocks. (Deposition of Arthur Altschul, pp. 37–38, 61, 76, 93, 104, 159–164, and Affidavit of Richard Fooshee, January 23, 1981, Ex. T).[2] In addition, Altschul testified that he often visited the Paine Webber office and spoke to his son and Michael Quarto, the office manager. According to Altschul, he did not complain about or question the activity in the account until he began to receive margin maintenance calls when, he testified, Quarto and his son told him not to worry. (Deposition of Arthur Altschul, pp. 76, 137–138, 141, 149–150, 160–164). He did not question the activity earlier, he testified because "I had complete trust in my son,"

(Deposition of Arthur Altschul, p. 38), and "I knew what he was doing." (Deposition of Arthur Altschul, p. 61). In addition, he testified that he relied on Paine Webber, through Quarto, to protect him. (Deposition of Arthur Altschul, pp. 65–69, 105, 120, 148).

## II.

Paine Webber contends that it is not liable on the churning, unsuitability and common-law claims because Arthur Altschul ratified all the transactions in the account by failing to disaffirm any of the transactions despite the knowledge that he was involved in speculative trading. According to Paine Webber, Altschul was a sophisticated investor who was perfectly satisfied by his speculative course of investment, despite its risks, until the gamble failed.

Paine Webber next argues that even if Altschul did not in fact ratify the transactions, he must be deemed to have ratified them because Richard acted as his agent with Arthur Altschul's consent. According to Paine Webber, Arthur Altschul's reliance on Richard, his acquiescence in Richard's decisions and his written authorization for Richard to act on his behalf serves to establish the agency relationship.

Paine Webber also contends that the churning claim must be dismissed because Paine Webber did not control the trading decisions, there was no excessive or objectionable trading, and the evidence does not support a finding of profit motivation on

---

**2.** For example, the following interchange occurred at Arthur Altschul's deposition:

Q  Do you consider any of these stocks that we talked about to be speculative?
A  I would say almost all of them.
Q  When did you first consider them to be speculative?
A  Well, when we started to buy them and I started to hear stories about gambling. I knew they were speculative because there was conversation wherever we went.
Any gambling stocks in my opinion were speculative.
Q  Did you ever direct anybody not to buy any more of that kind of stock?
A  No, by then the whole thing was out of my hands.

Q  You started off with what was the Ramada Inns. Was that a speculative stock?
A  Were they the first ones or was Del Webb?
Q  Did you consider Del Webb to be speculative when it came into your account?
A  It could have been because Sinatra had bought into it. It was in the papers. It was speculative.
Q  Did you ever tell anybody or tell Richard or Quarto that you should not have any more of that speculative stock in your account?
A  No.
Q  In fact, you watched the Del E. Webb build to 20,000 shares?
A  Yes, because the stock was going higher. (Deposition of Arthur Altschul, pp. 159–160).

the part of the broker since the commission was not high in relation to the total equity in the account and since in any event Arthur Altschul knew of and approved of the commissions.

Finally, Paine Webber argues that the claims relating to margin maintenance requirements must be dismissed because no private right of action exists under Regulation T, 12 C.F.R. § 220, or under Paine Webber's house maintenance requirements, and because all federal margin calls were met.

The Altschuls respond that Richard did not have discretion to trade his father's account because the power of attorney executed by Arthur Altschul was executed only in order to transfer the account to Paine Webber. This assertion is contained only in the affidavit of Altschuls' attorney. In addition, the Altschuls argue that they relied on Quarto to supervise Richard's management of the accounts and that Arthur Altschul was lulled into inaction by Richard's and Quarto's statements that he need not worry about his account. The Altschuls argue that Richard was not their agent, but rather the agent of Paine Webber. Finally, the Altschuls contend that a private right of action exists under both Regulation T and house margin requirements for a deliberate violation of margin maintenance rules.

### III.

■ Paine Webber's motion for summary judgment is granted as to the unsuitability, churning, and margin violation claims. Paine Webber has demonstrated that Arthur Altschul was a sophisticated investor who had full knowledge of the speculative nature of his investments and who failed to object to the course of investment until the gamble failed. The Altschuls present no evidence to negative Paine Webber's proof that Arthur Altschul was an experienced investor fully able to comprehend the trad-

ing in his account. To the contrary, Arthur Altschul himself has conceded that he had been investing in securities for forty years, he reviewed each confirmation and monthly statement, he knew what Richard was doing, and he did not complain because things were going well. Indeed, Arthur Altschul even concedes that he had no objection to the amount of commissions earned in the account, stating that "... there were a lot of commissions involved. I was very happy about that because my son was getting commissions." (Deposition of Arthur Altschul, p. 158). In short, the Altschuls' unsuitability and churning claims are based on the "heads I win, tails you lose" proposition that the Altschuls may recover for the losses sustained in their accounts despite their knowing acquiescence in the management of the accounts. The proposition is without merit. By failing to object to the course of trading in the accounts for approximately two years despite ample opportunity to do so, the Altschuls must be held to have ratified the transactions conducted on their behalf. They cannot hold Paine Webber responsible for mismanagement of an account, the management of which they continually approved. *See Ocrant v. Dean Witter & Co.*, 502 F.2d 854 (10th Cir. 1974); *Ferguson v. Francis I. duPont & Co.*, 369 F.Supp. 1099 (N.D.Tex.1974).

■ Furthermore, we agree with Paine Webber that the evidence overwhelmingly demonstrates that Altschul relied on his son Richard, not Paine Webber itself, to manage the accounts properly; and that Richard acted as the Altschuls' agent, rather than as the agent of Paine Webber. A finding of agency between the Altschuls and their son is dictated by the facts that Arthur Altschul executed a written authorization for Richard to act on his behalf even before Richard became employed at Paine Webber,[3] the Altschuls regularly permitted Richard to make investment deci-

---

**3.** The authorization specifically provided that "this will confirm the authority of Richard J. Altschul ... to purchase and sell securities and similar property and enter into those option contracts indicated below and also on my be-

half ... and to do whatever I personally could do in relation to the conduct of my account in connection with the transaction herein authorized." Affidavit of Richard Fooshee, January 23, 1981, Ex. N.

sions for the account, they permitted Richard to withdraw from and deposit money in the account, they relied on Richard's judgment in the management of the account and they acquiesced in Richard's control over the account. *See Ocrant v. Dean Witter & Co., supra.* In these circumstances, Paine Webber was entitled to consider Richard's actions as the actions of the Altschuls themselves and cannot be held liable under the theory of *respondeat superior.* *See Henricksen v. Henricksen,* 486 F.Supp. 622 (E.D.Wis.1980). In short, it was the Altschuls' own agent who took the actions about which they complain.

█ We also agree with Paine Webber that the churning claim must be dismissed because Arthur Altschul, himself or through Richard, controlled the account trading. Control by the broker is an essential element of a churning claim, *Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057, 1070 (2d Cir. 1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978). Moreover, the Altschuls have failed to contest Paine Webber's evidence that no churning in fact occurred. As Paine Webber has demonstrated, no "in-and-out" trading occurred. Instead, trading in the account was characterized by a consistent accumulation of stock, occasional sales of one security in order to buy another, and purchases of additional securities when the appreciation in the value of the portfolio gave the Altschuls additional buying power. (Affidavit of Richard Fooshee, January 23, 1981, ¶¶ 42–43, Ex. DD, EE). As this documentation shows, there were fewer than 2.5 trades per month in the accounts, and most were purchases. Thus, the activity in the account appears to reflect the aggressive pursuit of a speculative and accumulative trading strategy rather than an attempt to generate commissions for the account. *Cf. Kravitz v. Pressman, Frohlich & Frost, Inc.,* 447 F.Supp. 203, 206–208 (D.Mass.1978) (churning found where there were 21.5 trades per month and the pattern of trading was to sell securities a few days after purchase without any significant price change); *Hecht v. Harris, Upham & Co.,* 430 F.2d 1202 (9th Cir. 1970) (churning found where

122 trades per month and pattern of trading to sell stocks, immediately reinvest in new stocks, and shortly thereafter repeat the process with the new stocks).

█ As to the Altschuls' claims under Regulation T and house margin rules, we agree with Paine Webber that no private cause of action under federal law exists in these circumstances. Although a private right of action under Regulation T was recognized in *Pearlstein v. Scudder & German,* 429 F.2d 1136 (2d Cir. 1970) *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971) *(Pearlstein I),* the enactment by Congress in 1970 of § 7(f) of the Exchange Act, 15 U.S.C. § 78g(f) and the promulgation of Regulation X thereunder have "cast doubt on the continued viability of the rationale of (Pearlstein I)", *Pearlstein v. Scudder & German,* 527 F.2d 1141, 1143 n.3 (2d Cir. 1975) *(Pearlstein II),* by placing the responsibility for margin violations on both the broker and the customer. While there is some conflict among the courts of this Circuit as to the circumstances under which a violation of Regulation T may give rise to a federal claim, *compare, Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 465 F.Supp. 1233 (S.D.N.Y. 1979); *Establissement Tomis v. Shearson Hayden Stone Inc.,* 459 F.Supp. 1355 (S.D.N.Y.1978); *Gluck v. Frankel,* 440 F.Supp. 1143 (S.D.N.Y.1977) with *Palmer v. Thomson & McKinnon Auchincloss, Inc.,* 427 F.Supp. 915 (D.Conn.1977); *Evans v. Kerbs,* 411 F.Supp. 616 (S.D.N.Y.1976), it should at least be clear after the promulgation of Regulation X that an investor may not knowingly consent to violations of Regulation T and then seek to hold his broker liable when his investments fail. *See Panayotopulas v. Chemical Bank,* 464 F.Supp. 199, 203 (S.D.N.Y.1979); *Establissement Tomis, supra,* at 1360; *Freeman v. Marine Midland Bank-New York,* 419 F.Supp. 440, 452 (E.D.N.Y.1976). Here Arthur Altschul, either himself or through his agent, Richard, knowingly consented to the alleged violations of Regulation T throughout the relevant period. In any event, the Altschuls have failed to present any evidence to con-

test Paine Webber's demonstration that all federal margin calls were met. (Affidavit of Reinaldo Bozan, January 23, 1981).

■ House margin requirements, (as distinct from those imposed by government fiat) are established primarily to protect the broker by assuring sufficient collateral for credit extended to finance customer speculation, *see Carras v. Burns*, 516 F.2d 251, 260 (4th Cir. 1975); *Gordon v. duPont Glore Forgan Inc.*, 487 F.2d 1260, 1263 (5th Cir. 1973). They create no private cause of action by a customer because they were not promulgated on his behalf. *Cf. Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442 (2d Cir. 1971); *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178, 182 (2d Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966).

■ While Paine Webber is entitled to summary judgment on the unsuitability, churning and margin violation claims, Paine Webber has not addressed Altschul's evidence that Quarto repeatedly told him not to worry about the decline in his securities and thereby wrongly induced him to keep his account open. Paine Webber's motion for summary judgment is therefore denied with respect to Altschul's claims for negligence and fraud based on Quarto's alleged statements and conduct. However, Altschul's complaint with respect to these claims is at best unclear. Before this suit can proceed on these claims, Altschul must serve and file an amended complaint stating with particularity what statements and actions on the part of Quarto he complains of and in what manner he claims they were fraudulent or negligent. The present denial of Paine Webber's motion for summary judgment on these claims is without prejudice to a renewal of its motion once these claims are clarified.

\*   \*   \*   \*   \*   \*

■ For the reasons stated, Paine Webber's motion for summary judgment on the complaint and its counterclaims is granted to the extent indicated, except as to its claim for costs and attorneys' fees, which is denied since it does not appear that the Altschuls brought this action in bad faith.

It is so ordered.