**Rebecca J. SCHOFIELD,**
**Plaintiff, Appellant,**

v.

**FIRST COMMODITY CORPORATION OF BOSTON, Defendant, Appellee.**

**Rebecca J. SCHOFIELD,**
**Plaintiff, Appellee,**

v.

**FIRST COMMODITY CORPORATION OF BOSTON, Defendant, Appellant.**

**Nos. 85–1840, 85–1848.**

United States Court of Appeals, First Circuit.

Heard April 9, 1986.
Decided June 10, 1986.

Glen DeValerio with whom Harry A. Garfield, II and Berman, DeValerio & Pease, Boston, Mass., were on brief, for Rebecca J. Schofield.

Jeffrey V. Boxer, Boston, Mass., with whom Raymond H. Edelman, Brighton, Mass., was on brief, for First Commodity Corp. of Boston.

Before CAMPBELL, Chief Judge, COFFIN and BOWNES, Circuit Judges.

COFFIN, Circuit Judge.

Appellant Rebecca Schofield claims that First Commodity Corporation of Boston (FCCB) fraudulently induced her and her husband to invest all of their liquid assets in trading commodity futures. Her complaint alleged violations of three federal statutes, but the district court held that she failed to state viable claims under two of them, including the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c). The case proceeded to trial on claims under section 4b(A) of the Commodity Exchange Act (CEA), 7 U.S.C. § 6b(A) (1982), and a jury awarded appellant $30,000 in damages.

Appellant challenges dismissal of the RICO count,[1] claiming that the district court erred in finding that a RICO "enter-

prise" may not be held liable for civil damages under section 1962(c) either directly or under principles of *respondeat superior.* In a cross-appeal, FCCB challenges jury instructions on the CEA claims, including the court's refusal to instruct on the theory of ratification. We affirm the district court on all issues.

## I.

Section 1962(c) of RICO states:

"It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

Most courts, including the district court here, have construed the language of this subsection to require that the "person" who engages in the pattern of racketeering activity be an entity distinct from the "enterprise". *See United States v. Benny,* 786 F.2d 1410, 1415–16 (9th Cir.1986); *Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 315 (2d Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *B.F. Hirsch v. Enright Refining Co.,* 751 F.2d 628, 633–34 (3d Cir.1984); *Haroco v. American National Bank and Trust Co. of Chicago,* 747 F.2d 384, 401–02 (7th Cir.1984), *aff'd on other grounds,* — U.S. —, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); *Rae v. Union Bank,* 725 F.2d 478, 480–81 (9th Cir.1984); *Bennett v. Berg,* 685 F.2d 1053, 1061–62 (8th Cir.1982), *modified,* 710 F.2d 1361 (en banc), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1190 (4th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Yancoski v. E.F. Hutton Co.,* 581 F.Supp. 88, 97 (E.D.Penn.1983); *Van Schaick v. Church of Scientology,* 535

1. Appellant does not appeal the dismissal of her claim under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)(1982).

F.Supp. 1125, 1135–36 (D.Mass.1982); *Parnes v. Heinold Commodities, Inc.*, 548 F.Supp. 20, 23–24 (N.D.Ill.1982). Although a corporation may be a "person" under the statute, 18 U.S.C. § 1961(3), (4), these courts hold that the statute envisions liability only when there is the specified interaction between two entities; thus, the same corporation may not serve in two roles at the same time. Only one circuit has rejected the separate person/enterprise distinction. *United States v. Hartley*, 678 F.2d 961, 988 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 1183, 103 S.Ct. 815, 834, 74 L.Ed.2d 1014, 1027 (1983). *See also, e.g., Gerace v. Utica Veal Co.*, 580 F.Supp. 1465, 1469 n.4 (N.D.N.Y.1984); *B.F. Hirsch v. Enright Refining Co.*, 577 F.Supp. 339, 347 (D.N.J.1983), *rev'd* (on this issue), 751 F.2d 628, 633–34 (3d Cir.1984).

Appellant does not attack head-on the precedent holding that section 1962(c) requires that the person and the enterprise be two separate entities. Instead, she argues that a corporation may be held liable either directly as the section 1962(c) enterprise, or vicariously under principles of *respondeat superior*. We shall address first the theory of direct liability.

Appellant's argument regarding direct liability is as follows. The section 1962(c) "persons" are the FCCB account representatives with whom appellant directly transacted business, and the "enterprise" is FCCB. Thus, the requirement of two separate entities is met. Under the usual construction of section 1962(c), the brokers would be held liable if they conducted FCCB's affairs through a pattern of racketeering. Appellant argues that FCCB, the enterprise, also should be liable if the brokers' actions represented FCCB policy. In other words, in a case in which the enterprise is not a victim, but is an active participant in the racketeering, it also should be subject to liability. Appellant points out that the language in section 1962(c)—"It shall be unlawful"—is impersonal in form, and she suggests that this sentence structure means that the wrongdoing may be committed by the enterprise as well as by the person conducting the enterprise. In addition, she emphasizes Congressional intent that RICO be liberally construed, and the common sense notion that a culpable corporation should not be able to evade liability when its policies are at the heart of the wrongdoing.

■ Notwithstanding the appeal of appellant's argument as a matter of policy, we must reject it as a matter of law. Appellant is correct that Congress envisioned a broad reading of RICO, *Sedima, S.P.R.L. v. Imrex Co.*, —— U.S. ——, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985). Yet the Supreme Court in interpreting RICO also has made it clear that the words of the statute must be the starting point for any statutory construction. *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). It is only by straining the language that we could read section 1962(c) as imposing liability on even a culpable enterprise as well as on the person. Stripped to its essentials, section 1962(c) states that it is unlawful for any person associated with an enterprise to conduct that enterprise through racketeering. The enterprise is mentioned in the section only as the instrument of the person doing the racketeering, and there is no suggestion that the enterprise also may be liable, even if it is a wholly illegitimate operation.

"[The express language of section 1962(c)] quite clearly envisions a relationship between a 'person' and an 'enterprise' as an element of the offense which 1962(c) proscribes and for which 1964(c) would subject the 'person' to treble damages. . . .

"... It is only a person, or one associated with an enterprise, not the enterprise itself, who can violate the provisions of the section." *Van Schaick v. Church of Scientology of California*, 535 F.Supp. 1125, 1136 (D.Mass.1982).

The legislative history surrounding RICO adds to our conviction that section 1962(c) does not extend liability to the enterprise. "[T]he legislative history forcefully supports the view that the major purpose of Title IX [including section 1962(c)] is to

address the infiltration of legitimate business by organized crime." *United States v. Turkette*, 452 U.S. at 591, 101 S.Ct. at 2532. If the primary purpose of RICO is "to cope with the infiltration of legitimate businesses", *id.*, it is logical that Congress would have designed section 1962(c) so that it reached the criminal but protected the victimized enterprise from liability.

Moreover, an interpretation that insulates the enterprise from liability under section 1962(c) is not, as appellant asserts, inconsistent with the remedial purposes of RICO. *Cf. United States v. Turkette*, 452 U.S. at 589–90, 101 S.Ct. at 2531–32. On this point, we agree with the analysis of the Seventh Circuit in *Haroco v. American National Bank and Trust Co. of Chicago*, 747 F.2d at 401–02, which found that a culpable enterprise may be held liable under another section of RICO, § 1962(a). That section states, in relevant part:

> "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

The language in section 1962(a) does not require a relationship between the person and the enterprise as does section 1962(c), and so it does not require the involvement of two separate entities. Applied to the facts of this case, section 1962(a) would prohibit FCCB, the person, from using ill-gotten gains in FCCB, the enterprise. In contrast, section 1962(c) requires that the culpable person be "employed by or associated with" an enterprise; we think it stretches the language too far to suggest that a corporation can be employed by or associated with itself. This approach to the two subsections

> "thus makes the corporation-enterprise liable under RICO when the corporation is actually the direct or indirect beneficiary of the pattern of racketeering activity, but not when it is merely the victim, prize, or passive instrument of racketeering. This result is in accord with the primary purpose of RICO, which, after all, is to reach those who ultimately profit from racketeering, not those who are victimized by it." *Haroco*, 747 F.2d at 402.

*See also Masi v. Ford City Bank and Trust Co.*, 779 F.2d 397, 401–02 (7th Cir. 1985); *Bennett v. United States Trust Co. of New York*, 770 F.2d at 315 (2d Cir.1985); *B.F. Hirsch v. Enright Refining Co.*, 751 F.2d 628, 633–34 (3d Cir.1984); *The Bruss Co. v. Allnet Communication Services*, 606 F.Supp. 401, 407 (N.D.Ill.1985).[2]

We think it worth noting that at least one court has taken issue with this manner of resolving the policy concerns behind RICO. In *Rush v. Oppenheimer & Co.*, 628 F.Supp. 1188, 1197 (S.D.N.Y.1985), the court concluded that, in light of the identical terminology in each subsection and the consistent legislative intent to convict only the violator of the predicate acts, and not the infiltrated enterprise, "if it is inappropriate to plead identity in 1962(c), it is then inappropriate to plead it under section 1962(a)". Thus, the court refused to allow a dual corporate role under either subsection. *See also* Note, *Judicial Efforts to Redirect an Errant Statute: Civil RICO and the Misapplication of Vicarious Cor-*

---

**2.** We recognize that funneling corporate liability into subsection (a) may affect plaintiffs in ways other than simply in the drafting of the complaint under one subsection rather than another. *See* Note, *Judicial Efforts to Redirect an Errant Statute: Civil RICO and the Misapplication of Vicarious Corporate Liability*, 65 Boston U.L.Rev. 561, 596–98 (1985). For example, subsection (a) requires a showing of the source of income and proof that funds were channeled into the corporation. It also covers only wrongdoing involving money. But if neither section 1962(a) nor section 1962(c) cover all methods of corporate wrongdoing, it is up to Congress, and not the courts, to expand the scope of the statute. We rely on section 1962(a) only to show that our reading of section 1962(c) does not insulate corporations from *all* liability.

porate Liability, 65 Boston U.L.Rev. 561, 595 (1985) (hereinafter "Errant Statute") (questioning the distinction between the two subsections).

We disagree with this approach to statutory construction, and to construction of RICO, in particular. In a sense, the *Rush* court has interpreted both subsections of section 1962 together; because the language of one is not susceptible to a reading that the enterprise can serve in two roles, it concludes that the other subsection is similarly limited. But we read *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), to say that where the language in RICO permits liability against a culpable entity, courts should find that such liability exists. In *Turkette*, the Court rejected the argument that the word "enterprise" as used in RICO referred only to legitimate businesses, observing that the contrary construction would put much organized criminal activity beyond the substantive reach of the statute. *Id.* at 589, 101 S.Ct. at 2531. The Court settled on the broader meaning of enterprise despite the unambiguous legislative history showing that Congress' primary concern was the infiltration of *legitimate* enterprises.

Because a narrow reading of section 1962(a) also would insulate much criminal activity, and because the language permits a broader reading, that section must be read to allow corporations to serve both as the RICO person and the RICO enterprise. Section 1962(c), in contrast, does not give us the same flexibility. Its language, requiring a relationship of employment or association between the person and the enterprise and pinpointing liability on the person, simply does not permit us to find liability against the enterprise. Accordingly, we reject appellant's argument that FCCB may be held directly liable under section 1962(c).

We thus turn to appellant's alternative argument that principles of *respondeat superior* operate so as to make FCCB liable under RICO for the fraudulent actions of its brokers. Like the issue of the enterprise/person distinction, the applicability of *respondeat superior* to section 1962(c) has generated conflicting responses from the courts, although again the majority rejects vicarious corporate liability. *See, e.g., Haroco*, 747 F.2d at 401 n. 18 (suggesting vicarious liability may be appropriate under section 1962(a) but not under section 1962(c)); *Rush v. Oppenheimer*, 628 F.Supp. at 1194–95; *Parnes*, 548 F.Supp. at 24 and n. 9; *Dakis v. Chapman*, 574 F.Supp. 757, 759–60 (N.D.Cal.1983).[3] The most frequently cited case in support of appellant's proposition is *Bernstein v. IDT Corp.*, 582 F.Supp. 1079, 1083 (D.Del.1984), where the court observed that "the normal rules of agency law apply in the absence of some indication that Congress had a contrary intent". *See also Morley v. Cohen*, 610 F.Supp. 798, 811 (D.Md.1985).

 We agree with the *Bernstein* court's proposition of law, but disagree as to where it leads in this case. The premise of *respondeat superior* is that one who is without fault may be held vicariously liable for the wrongdoing of another. W. Prosser, *Law of Torts* 458 (4th ed. 1971). As our previous discussion of direct liability reveals, we think the concept of vicarious liability is directly at odds with the Congressional intent behind section 1962(c). Both the language of that subsection and the articulated primary motivation behind RICO show that Congress intended to separate the enterprise from the criminal "person" or "persons". Indeed, there is unlikely to be a situation, in the absence of an express statement, in which Congress more clearly indicates that *respondeat superior* is contrary to its intent. *But see* G. Bla-

---

**3.** We acknowledge that in some of these cases, the courts have rejected *respondeat superior* only because the corporation was not sufficiently involved in the wrongdoing, suggesting that liability would attach if the corporation actively participated in the prohibited activity. *See, e.g.,*

*Parnes*, 548 F.Supp. at 24 and n.9; *Dakis*, 574 F.Supp. at 759–60. We think even a conditional approach to *respondeat superior* is inconsistent with our prior conclusion on direct liability, and so we choose not to adopt it.

key, *The Civil RICO Fraud Action in Context: Reflections on Bennett v. Berg,* 58 Notre Dame L.Rev. 237, 308–25 (1982).

We draw further support for this conclusion from two recent cases, one from the Supreme Court and one from our own court, which considered the application of agency principles to similarly complex statutory schemes. In *American Society of Mechanical Engineers (A.S.M.E.) v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982), the Court held a corporation liable under the antitrust laws for the antitrust violations of its agents committed with apparent authority. In doing so, it noted that it could best honor the statutory purposes of the antitrust private cause of action by interpreting it "to be at least as broad as a plaintiff's right to sue for analogous torts, *absent indications that the antitrust laws are not intended to reach so far",* id. at 569, 102 S.Ct. at 1944 (emphasis added). Unlike section 1962(c), however, with its precise language of relationship between two entities, the antitrust laws sweep broadly and extend liability to "[e]very person", 15 U.S.C. §§ 1, 2, 3, and define "person" to include corporations and associations, 15 U.S.C. § 7. *A.S.M.E.,* 456 U.S. at 573 n. 11, 102 S.Ct. at 1946 n. 11.

In *In re Atlantic Financial Management, Inc.,* 784 F.2d 29 (1st Cir.1986), we relied on *A.S.M.E.* to conclude that section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), does not preclude the assertion of vicarious liability against a corporation for the misrepresentations of an important corporate officer. We stated our conclusion narrowly, however, because we recognized that "the extent to which a federal statute ... embraces common law agency principles[ ] depends (as the Supreme Court stressed in the antitrust context) upon the extent to which their adoption is consistent with the statute's language and furthers its purposes". *Id.* at 35 (emphasis omitted). As in *A.S.M.E.,* the broad statutory language and legislative history at issue in *Atlantic Financial Management* led us to find that Congress anticipated the application of common law

vicarious liability in that context. *Id.* at 32–33.

The present case is unlike *A.S.M.E.* or *Atlantic Financial Management.* In contrast to the antitrust and securities provisions at issue in those cases, the language of section 1962(c) is phrased so as to limit rather than expand the range of potential violators. Moreover, the legislative history tells us that Congress had a specific target in mind with this statute, the individual wrongdoer, in contrast to the more general purposes behind the antitrust and securities acts.

Appellant apparently concedes that a wholesale adoption of the *respondeat superior* concept would conflict with the primary thrust of section 1962(c). In order to conform to Congress' obvious desire to insulate legitimate businesses from liability, she suggests that we could adopt a modified version of vicarious liability, perhaps requiring some level of *scienter* before imposing liability. For example, *respondeat superior* could be limited to acts of high corporate officials, whose actions may be deemed corporate policy, and thus would reflect corporate intent.

The flaw in this approach is that it is no more than a recasting of the argument for direct liability. In either form, appellant's argument is that corporations at least should be liable when they participate in causing the wrongdoing that RICO punishes. We concede the appeal of this argument, and wholeheartedly agree that corporations should not escape liability when their policies foster the racketeering activity that is at the heart of RICO's prohibitions. But as we now have stated more than once in this opinion, the language of section 1962(c) poses a formidable barrier to holding the enterprise liable under that subsection. We think it inappropriate to use *respondeat superior* to accomplish indirectly what we have concluded the statute directly denies. We therefore hold that the district court correctly dismissed appel-

lant's claim against FCCB under section 1962(c).[4]

## II.

FCCB claims the district court erred in three respects: denying FCCB's claim for a directed verdict; giving a charge that allowed the jury to find liability solely on the basis of appellant's unsuitability for investing in commodities; and failing to give an instruction on ratification. We provide a few salient facts before considering each of these arguments.

Appellant's claim is that FCCB violated the anti-fraud section of the Commodity Exchange Act by persuading her to open an account without adequately disclosing the risks of trading in commodity futures, continually misrepresenting the status of the account, and deducting exorbitant fees from her account. She originally invested about $151,000 with FCCB in early 1982. During the approximately 15 months the account was open, FCCB charged more than $66,000 in fees. At one point, appellant closed the account, but reopened it approximately one month later. She eventually withdrew about $120,000 from the account. The jury awarded plaintiff $30,000 in damages.

*Denial of Directed Verdict.* FCCB contends that it was entitled to a directed verdict because plaintiff's claim was, in essence, that she was "unsuitable" for investing in commodities and that there is no cause of action for unsuitability under section 4b(A) of the Commodity Exchange Act (CEA), 7 U.S.C. § 6b(A) (1982). Section 4b(A) of the CEA provides that "[i]t shall be unlawful ... to cheat or defraud or attempt to cheat or defraud such other person".

██ FCCB is correct that courts have rejected a suitability cause of action under this subsection. *See, e.g., Myron v. Hauser*, 673 F.2d 994, 1005–06 (8th Cir.1982); *J.E. Hoetger & Co. v. Asencio*, 558 F.Supp. 1361, 1364 (E.D.Mich.1983); *Vaneck v. Bache Halsey Stuart Shields, Inc.*, Comm. Fut.L.Rep. (CCH) ¶ 21,697. In other words, these courts have held that there is no cause of action against a broker or investment company for failing to advise customers that a particular investment is unsuitable for them. This precedent is of no help to FCCB. FCCB's failure to inform appellant that she was an unsuitable commodities investor was only one element of her fraud claim. In addition, she alleged failure to adequately disclose the risks of trading in commodity futures, and persistent misrepresentation of the amount earned and the future potential for making money. Appellant's claim was not that "FCCB should be required to protect Plaintiff from her own greed" [FCCB brief at 31], but that FCCB fraudulently induced appellant to invest and maintain all of her liquid assets in commodity futures by what it did and did not tell her about such an investment. This is a cognizable claim under section 4b(A). *See Crook v. Shearson Loeb Rhodes, Inc.*, 591 F.Supp. 40, 48–49 (N.D.Ind.1983) (broker violated section 4b(A) by recklessly misleading investor on realities of the commodities market); *Vaneck v. Bache Halsey Stuart Shields, Inc.*, Comm.Fut.L.Rep. ¶ 21,697 (March 30, 1983) (failure to disclose or misrepresentation of risks of investment cognizable as fraud under section 4b(A)); *Gordon v. Shearson Hayden Stone, Inc.*, Comm.Fut.L.Rep. ¶ 21,016 (CFTC April 10, 1980) (failure to inform investor of risk in commodity futures transaction is breach of fiduciary duty and constitutes violation of section 4b(A)). We therefore affirm the district

---

4. One commentator agrees that vicarious liability principles are inappropriate in the context of RICO, and argues that courts interpreting RICO instead should adopt agency law principles as they traditionally are used to determine direct corporate liability in the tort context. *See* "Errant Statute", 65 Boston U.L.Rev. 561, 598–605. This commentator asserts that this approach would "simply follow[ ] the statute's verbs. The person held liable under RICO must have invested, participated, acquired or conspired." *Id.* at 604. What is unclear in this analysis is how the commentator overrides the language in section 1962(c) that forecloses liability against a corporation when it serves only in the role of enterprise, or when it serves in both roles at the same time.

court's decision denying FCCB's motion for a directed verdict.[5]

*Jury Charge on Suitability.* FCCB claims that the district court's instructions allowed the jury to find liability solely on a theory of suitability even though no such cause of action is available under section 4b(A). The part of the jury charge to which FCCB takes issue related to damages. After outlining the elements of the section 4b claim, the district court specified the two methods the jury could use to calculate damages. The first method was applicable if the jury found that FCCB had charged excessive fees for trading appellant's account. That calculation involved adding back into appellant's assets the excessive portion of the fees charged for FCCB's services, and then determining what profit she would have made had her account included those extra funds. The court then charged the jurors on how to calculate damages if they found the fees were not excessive:

"If you find that the fee was not excessive, but that the plaintiff was not in fact a person suitable for commodities trading—that is, if you find that the defendant improperly took her on as a customer *and misrepresented to her* that she was a suitable customer—then she still has a loss. It's computed differently, but she still has a loss. And that is what she is out of pocket. . . .

"So if you find that the defendant *misrepresented her suitability* but that the fees were not excessive, she is entitled to recover that out-of-pocket loss, the difference between what she gave them and what she took back over the period of time, the total that she took back.

"Here you are not concerned with what she may have learned later on because you're focusing on her suitability at the beginning of the period. So it's just a difference between what she paid

in and what she got out in toto." (Emphasis added.)

▪ Although this section of the instruction narrowly focuses on misrepresentation of appellant's suitability for commodities trading, and is thus more limited in scope than the misrepresentation alleged by appellant, we think the jury would not have been misled into finding liability solely on the basis of unsuitability, without misrepresentation. The court had clearly listed the five elements necessary to prevail under section 4b(A), including misrepresentation, which the court described as "really the most important [element] in this case". The court explained in detail the nature of the deception that had to be proven, and what factors the jury should consider in deciding the question. Her charge included the following:

"Now, in making this judgment, review the evidence first, consider the testimony that you heard, look at the tapes, the transcripts of the tapes, look at the disclosure statement, look at the month-end statement, and then decide what did the plaintiff tell Mssrs. Severino and McKenna about her finances, about her financial resources and her need; what did they say to her in December of 1981 and January of 1982, when the account began, and then also later on. But initially at that first stage. How did they explain commodities trading to her? How did they explain the risks that are attendant on such trading? What did they tell her about the fees? How did they explain the fees? Were the written and the oral statements understandable by a reasonable person or not? What did the monthly statements show? Were there any explanations of any symbols or shorthand that was used in the monthly statements that were sent out to Mrs. Schofield?"

In light of the lengthy and detailed description of the misrepresentation element of

**5.** In its brief, appellee FCCB argued that the district court erred in denying the motion for directed verdict because appellant alleged only an unsuitability claim and such a claim is not actionable under section 4b(A). It did not argue that the evidence as presented at trial added up only to a claim for unsuitability. We have considered the issue in the light presented to us, focusing on the alleged misrepresentations and not on the facts as adduced at trial on this issue.

section 4b(A), we do not believe the court's references to suitability in the damages portion of the charge would be construed as adding a separate unsuitability claim to the case. Even if, on their own, certain phrases in the damages charge are susceptible to such an interpretation, it would be of no avail to FCCB. Our task is not to scrutinize every word of the charge for possible meanings, but to evaluate the charge as a whole. *See Cupp v. Naughton,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) ("a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge"). The court's instruction here clearly required the jury to find misrepresentation. We therefore hold that the district court did not err in rejecting FCCB's objection to the jury charge.

*Ratification.* FCCB argues that the district court erred in failing to instruct the jury on ratification. The proposed instruction would have stated that, even in the face of misrepresentations, the jury could find for the company if appellant continued to do business with FCCB after she knew the amount of her fees and the extent of her losses, and thereby ratified what the company had done. FCCB claims that such an instruction was warranted because appellant received account statements detailing the fees charged; she stated that she understood commodities were a high risk, speculative investment; she was fully apprised of the trading of her account throughout her period of investment; and she reopened the account a month after first closing it.

Ratification is a doctrine of agency law in which a principal is deemed to adopt the previously unauthorized actions of his or her agent by failing to object after finding out about them. H. Reuschlein and W. Gregory, 72 *Agency and Partnership* (1979); *Jaksich v. Thomas McKinnon Securities, Inc.,* 582 F.Supp. 485, 496 (S.D.N.Y.1984) (plaintiff's failure to object to defendant's unauthorized purchase of stock even after she became aware of it and had opportunity to object constituted ratification); *Altschul v. Paine, Webber, Jack-*

son & *Curtis,* 518 F.Supp. 591, 594 (S.D.N.Y.1981) (plaintiffs' failure to object to defendants' course of trading for two years, until the risk failed, despite ample opportunity to so object, constituted ratification).

■ We conclude that the theory of ratification is inconsistent with the facts of this case. The primary wrongdoing alleged by appellant is the misrepresentation that induced her to invest in commodities futures and the excessive fees. FCCB claims that appellant "ratified" the commodities investing and the high fees because she maintained her account even after learning of the account losses and fee charges. But this situation is not one of ratification. Because ratification is the principal's adoption of an agent's action, the concept necessarily requires an act of the agent as agent. For example, in some ratification cases, the investor, after a silent period of apparent acceptance, seeks to challenge a particular trade, or a series of trades, made by the broker. *See Jaksich,* 582 F.Supp. at 497; *Altschul,* 518 F.Supp. at 594; *Ferguson v. Francis I. duPont & Co.,* 369 F.Supp. 1099 (N.D.Tex.1974). In contrast, appellant's claim is based on the interactions between herself and the brokers, and not on actions taken by FCCB on her behalf. She is not challenging defendant's specific investments, which ultimately showed a profit, but claims fraud in the way FCCB acted in acquiring and keeping her as a customer. We think it is illogical to suggest that appellant "ratified" FCCB's unauthorized actions, the misrepresentations, and thereby "adopted" the decision to invest with FCCB. We similarly reject any argument that appellant "ratified" the allegedly excessive fees because she failed to object to them after receiving account statements showing the amounts deducted. It stretches the concept of ratification beyond all meaning to say that appellant could adopt as her own the action of charging high fees.

The appropriate instruction in this case to ensure that appellant received only those damages to which she was entitled was the

one given by the district court on mitigation of damages:

"Now, there is a caveat to that [calculation of damages], one caution. You have to consider whether the plaintiff at any time before April of 1983 knew or should have known that the defendant's conduct was improper. If you find that at some time before April of 1983, when she got out of the market, she knew or should have known of the misrepresentations, then she is entitled to damages only up to that point. That is, once she knows that they are acting improperly, she has an obligation to cut her losses. She can't just keep on riding with them, and she would at that point have to get out of the market.

"So, if you find that she knew at some time before then, then you will have to compute what profits she would have had up to that point and not through the entire period, until April of 1983."

This charge properly required the jury to consider whether appellant unjustifiably continued her relationship with FCCB once she discovered that she had been deceived. Although a theory of ratification eliminating all damages is illogical in this context, it is appropriate to limit damages to those caused by FCCB's misrepresentations. We therefore hold that the district court did not err in rejecting FCCB's proposed instruction on ratification.

*For the foregoing reasons, the judgment of the district court is affirmed. Each party shall bear its own costs.*