COOPERATIVA de AHORRO y CREDITO AGUADA, Plaintiff,

v.

KIDDER, PEABODY & CO.; Paine Webber Incorporated; Ramón M. Almonte, Jane Doe, and the property partnership existing between them, Defendants.

Civ. No. 89–1706 (JAF).

United States District Court, D. Puerto Rico.

Jan. 30, 1991.

Roberto Boneta, Enrique Peral, Muñoz Boneta Arbona Benitez & Peral, San Juan, P.R., for Cooperativa de Ahorro y Credito Aguada.

Harry F. Woods, Woods & Woods, San Juan, P.R., for Ramón M. Almonte.

Néstor Méndez–Gómez, Richard Graffam, McConnell Valdes Kelley Sifre Griggs & Ruiz–Suria, San Juan, P.R., for Kidder, Peabody.

Guillermo J. Bobonis, Bobonis Bobonis & Rodriguez Poventud, Condado, P.R., for Paine Webber.

## OPINION AND ORDER

FUSTE, District Judge.

### I. *Introduction*

Plaintiff Cooperativa ("Coop") is a single-branch savings and loan institution incorporated and operating in Puerto Rico. Defendants Kidder, Peabody & Co. ("Kidder") and Paine Webber Incorporated ("Paine Webber") are financial services providers through whom plaintiff purchased various securities. Defendant Ramón Almonte ("Almonte")[1] was the securities representative, first as an employee of Kidder and later as an employee of Paine Webber, who recommended and carried out securities purchases for plaintiff. Plaintiff claims that at all times it has sought investments which are unspeculative and which would provide a safe, moderate rate of return. Plaintiff complains that Almonte, while working at Kidder in 1986, fraudulently induced the Coop to invest over three and a half million dollars in Drexel Burnham "junk bond" funds. Though both sides now agree that the funds consisted of high risk, high yield bonds, plaintiff claims that at the time of purchase Almonte fraudulently led the Coop to believe that the funds represented a low risk, conservative investment, appropriate for the needs of the Coop's depositors. Subsequently, particularly in 1989, the value of the bonds dropped precipitously, leading finally to a liquidation when they fell to less than 50% of their original principal value. Plaintiff alleges a cause of action under the federal securities laws, the RICO statute, and common law fraud. Plaintiff claims a loss of principal of $778,818.57, along with the loss

---

1. Almonte's wife, Mayleen Gratacós, is named as a nominal defendant, as is the "community partnership existing between them," since such a partnership is a legal entity under Puerto Rico law which can sue and be sued. Since there is no allegation of wrongdoing by Gratacós, the liability of the marriage partnership is only at issue for purposes of collecting damages. Under Puerto Rico law, "conjugal partnerships of defendants are proper and even necessary parties." *Mercado–Vega v. Martinez,* 666 F.Supp. 3, 6 (D.P.R.1986).

of the interest which the Coop would have received from an "appropriate" investment.

In cause of action I, the Coop argues that the fraud violates the federal securities laws, specifically section 10(b) of the 1934 Securities Act, Rule 10b–5, section 15(c)(1)–(2) of the 1934 Act, section 17(a) of the 1933 Act, and section 20 of the 1934 Act. In cause of action II, the Coop claims the fraud is actionable under Puerto Rico law, and that pendent jurisdiction exists. In cause of action III, the Coop claims that the fraud was a part of a pattern of racketeering prohibited by the RICO statute.

As to the federal securities law claim, defendants argue in respective motions to dismiss for failure to state a claim that, *inter alia:* 1) the federal securities issues are time barred; 2) no private right of action exists under section 15(c)(1)–(2) of the 1934 Act or section 17(a) of the 1933 Securities Act, and 3) plaintiff has not alleged scienter as a required element of its claim. Paine Webber denies all potential liability under the securities acts on the theory that the only act alleged which could *possibly* trigger a violation was the original sale of the funds to the Coop in 1986, a time when Coop's account was still with Kidder.

The Supreme Court has recently agreed to review a split in the circuits as to which statute of limitations would apply to the federal securities laws at issue here. Since that case may render all the federal securities law claims here untimely, we reserve judgment on federal securities law question pending a ruling by the Supreme Court in *Lampf Pleva Lipkind Prupis & Petigrow v. Gilbertson*, — U.S. —, 111 S.Ct. 242, 112 L.Ed.2d 201 (1990). *See* 22 B.N.A. Securities Regulation and Law Report at 1439. We **dismiss** the RICO claims against Kidder for failure to state a cause of action. We **dismiss** the RICO claims against Paine Webber for failure to state a cause of action. We **order** plaintiff to amend its RICO pleading with regard to the predicate fraudulent acts for purposes of Almonte's tenure at Paine Webber, 18 U.S.C. § 1962(c), since such pleading does not currently comply with the specificity require-

ment of Fed.R.Civ.P. 9(b). We also stay disposition of the common law fraud claims since no independent basis for jurisdiction is alleged, leaving the common law fraud claims subject to the fate of the federally-based causes.

II. *Facts for Purposes of Motion to Dismiss Under Rules 12(b) and 9(b)*

Plaintiff Coop is a savings and loan cooperative organized and existing under the laws of Puerto Rico. Depositors have a share in the cooperative in proportion to their assets. The cooperative is operated by a Board of Directors and an Administrator. The Coop's investors are mainly salaried individuals of moderate means. The Coop seeks to provide investments of the assets under its control that provide secure, moderate return on investment. Traditionally, savings and loan cooperatives in Puerto Rico have invested their funds primarily in time deposit accounts of commercial banks and government securities.

In 1983 the Coop was approached by William Torres ("Torres"), a registered representative of Kidder. Torres advised on and executed several investments for the Coop. Torres gave presentations to the Coop and other cooperatives concerning the investment needs of savings and loan cooperatives.

In June of 1986, Torres passed the Coop's account to defendant Almonte, recommending Almonte highly. Shortly after the transfer, Almonte proposed to Luis Feliciano, Assistant Manager of the Coop, that the Coop invest in Drexel Burnham Lambert Unit Trusts. According to the complaint, Almonte told Feliciano that the Drexel funds were safe and unspeculative, since they were "sponsored" by Drexel Burnham, a reputable national brokerage, that the Coop could expect a steady stream of income for a long term as they were not redeemable for 7–10 years, and that the purchase of the funds was appropriate for the needs and objectives of the Coop. Although plaintiff is not clear about the exact date or dates of the alleged misrepresentation, the complaint, read broadly, implies that at least one phone call in June of 1986 contained such statements. Based on this

recommendation, plaintiff purchased, on three occasions between June 23, 1986 and December 16, 1986, a total of $3,563,665.80 worth of Drexel Series 10 and Series 2 "High Income Trust Securities."

The complaint lists those aspects of the bond funds that Almonte failed to mention, from which we now excerpt:

1. That the bonds underlying the trust were either unrated or had very low ratings, between BB/Ba and C/C by Standard & Poors and Moody's;

2. The bonds which composed the fund ranged from primarily speculative with respect to capacity to pay interest and repay principal, to bonds with an extremely poor prospect of attaining any real investment standing;

3. That Drexel had no obligation to maintain a secondary market for the bonds.

The Coop's list of those facts which Almonte failed to disclose was culled directly a prospectus prepared by Drexel for prospective investors. That such a prospectus existed at all is not discussed in the pleadings. A copy of the prospectus is brought to the court's attention for the first time in the plaintiff's opposition to the current motion. Plaintiff claims it never received a copy of the prospectus. Since we choose today to rule on the pleadings, we give no weight to the prospectus provided by plaintiff, and consider it a factual matter outside the pleadings. In any event, there is no prejudice to the plaintiff, since the document would have no effect on any of the rulings we make today, even if we were to take cognizance of it. If it becomes relevant in the future, this court may convert this motion to one for summary judgment, giving all parties appropriate opportunity to file as they see fit. At present we think judicial economy militates towards confin-ing our ruling to an attack on the pleadings.

### A. Post–Purchase Activity

In June 1987, Almonte left Kidder to take a position with Paine Webber, taking the Coop's investment portfolio with him. The value of the funds remained relatively stable until late 1988, when a rapid drop began. During the period from the 1986 purchases until late 1988, defendants (first Kidder and Almonte, then Paine Webber and Almonte) supplied the Coop with periodic statements of account containing the market prices of the securities at issue. According to plaintiff, the defendants continued to make misrepresentations and to conceal the original fraud during this period in that they failed to alert the Coop to the possibility that these investments were not proper for the Coop.

On January 18, 1989, Almonte (then employed by Paine Webber) sent a letter to the Coop stating that "all funds are performing as expected since inception." The January 18 letter misstated per-share values, artificially inflating the market price of the funds. Almonte stated that the bidding price for Drexel unit series No. 10 was $887.37 and the bidding price for Drexel unit series No. 2 was $604.35. In fact, the bidding price for each was exactly $100 less per unit.[2]

At some time shortly after the January letter, Paine Webber stopped supplying statement accounts, stating that the information was "not available." In July 1989, the trusts were liquidated by the trustee, since they had fallen to below 50% of their original principal value. Such a liquidation, triggered by the 50% value threshold, was a required part of the trust purchase agreement.

**2.** While the complaint alleges the basic facts surrounding the January 18th letter, some additional facts were supplied by plaintiff's opposition to the current motion. Since none of those facts were considered necessary by the court in making today's rulings, the obligation to trigger a conversion to summary judgment did not occur. For instance, the opposition identifies by just how much ($100 per share) the January 18th letter inflated the true value of the trusts. The complaint did not specify the amount. It is not relevant to our ruling today whether those additional facts were before us or not. Any reference to facts contained in the opposition but not in the complaint is incidental. In any event, the discrepancy between what is contained in the opposition and what is contained in the complaint will likely be eliminated by the amendment to the complaint which we order today.

In summation, a time line of events appears as follows:

–1983: The Coop begins an investment portfolio with Kidder.

–June 1986: The Coop's portfolio is transferred to Almonte, a Kidder representative. Almonte recommends Drexel trusts.

–June 1986–December 16, 1986: The Coop invests over $3.5 Million dollars in Drexel Series 10 and Series 2 High Interest Trusts.

–December 1986–June 1987: Almonte services account while at Kidder. No significant changes in account occur.

–December 28, 1986: Relevant date for statute of limitations if applying federal rule (three years before action filed).

–June 1987: Almonte moves to Paine Webber, taking account with him.

–December 28, 1987: Relevant date for federal securities statute of limitations if Puerto Rico Blue Sky statute is applied (two years prior to filing date).

–December 28, 1988: Statute of limitations for Puerto Rico Civil Code for fraud or deceit action (one year prior to filing date).

–January 18, 1989: Almonte's letter misstating value of trusts.

–April 1989: (Approx.) Paine Webber and/or Almonte stop supplying value of trusts.

–July 1989: Trusts automatically liquidated by trustee. The Coop suffers loss.

–December 28, 1989: Present action filed.

■■■ The current motion is made on various grounds under Rule 12(b)(6) for failure to state a claim upon which relief may be granted, including failure to plead a sufficient reason to toll the statute of limitations. In addition, defendants claim that the fraud elements, as predicate acts for RICO purposes, are not pleaded with sufficient specificity for purposes of Rule 9(b). We therefore accept the above well-pled facts as true for purposes of the motion, and construe them in the light most favorable to the plaintiff. As to Rule 12(b), we can grant defendants relief only on those cases in which the pleading shows no

set of facts which could entitle plaintiff to relief. *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988); *Chongris v. Board of Appeals*, 811 F.2d 36, 37 (1st Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987); *Conley v. Gibson*, 355 U.S. 41, 45–48, 78 S.Ct. 99, 101–103, 2 L.Ed.2d 80 (1957). As to the Rule 9(b) issue, we can dismiss or order that the insufficient pleading be amended. *New England Data Services Inc. v. Becher*, 829 F.2d 286 (1st Cir.1987).

### III. Statutes of Limitations For Federal Securities Law Issue

■■■ We feel it necessary to explain our decision to reserve judgment on the securities issues pending a ruling in *Lampf Pleva*, to the degree of demonstrating that the timeliness of this cause, based on the dates that events occurred here, is indeed dependant on which limitations rule we finally choose to adopt.

#### A. Applying the State Rule

The statutory sections relied upon by plaintiff contain no explicit limitations period. In the face of a silent federal statute, federal courts have traditionally looked to analogous state statutes of limitations. *International Union v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966) (six-year state contract limitations statute applied in section 301 suit for back wages). Courts in this district have applied Puerto Rico's two-year Blue Sky Law limitation period for section 10(b), Rule 10b–5, and section 17(a) actions. *Rodríguez v. Montalvo*, 649 F.Supp. 1169 (D.P.R.1986), *aff'd*, 871 F.2d 163 (1st Cir. 1989); *Verrecchia v. Paine Webber Jackson & Curtis*, 563 F.Supp. 360 (D.P.R. 1982); *Valles Salgado v. Piedmont Capital Corp.*, 534 F.Supp. 938 (D.P.R.1981). While the First Circuit has not spoken specifically on the propriety of the Puerto Rico Blue Sky law, the Circuit has approved of use of a Massachusetts state rule for a securities claim brought in that state. *See Cook v. Avien, Inc.*, 573 F.2d 685 (1st Cir. 1978) (Massachusetts personal tort suit limitations period applies to securities law

claim brought in Massachusetts federal district court). While the length of the limitation period is taken from state law, a federal rule is applied to determine when the statute of limitations period begins to run. *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 127 (1st Cir.1987). "Under federal law, the doctrine of fraudulent concealment operates to toll the statute of limitations 'where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part ... until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.'" (Citations omitted). *Maggio*, 824 F.2d at 127 (citing to *Cook*, 573 F.2d at 694). The First Circuit looks for "storm warnings" of the possibility of fraud which then trigger a plaintiff's duty to investigate in a reasonably diligent manner. *Maggio*, 824 F.2d at 128. Assuming Puerto Rico's two-year rule, and the federal rule governing tolling, a complaint is timely if filed within two years of the date at which a reasonable investor would have had sufficient hints of fraud as to make a reasonably diligent inquiry.

### B. Applying the Federal Rule

Since the early 1980's, however, the Supreme Court has shown a greater willingness in a variety of contexts to look to analogous *federal* statutes of limitations in finding an applicable timeliness rule. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987); *Del Costello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). In the case of the securities laws, the obvious federal "analogy" for the section 10(b), section 15 of the 1934 Act, and section 17 of the 1933 Act[3] are the "companion" provisions in the 1934 Act which have specific limitations periods. Those limitations periods are codified at 15 U.S.C. sections 78i(e), 78r(c), and 78cc(b). All three provisions provide for a period of limitations of (a) one year after "inquiry notice" of the alleged violation, *and* (b) within three years of the predicate act giving rise to the liability, regardless of notice.[4]

We have, therefore, two potentially applicable rules, the state and the federal. In order to see why the decision of which rule applies is so relevant here, we must determine which of the alleged acts are properly "predicate" acts under the securities laws.

### C. Predicate Acts For Limitations Analysis

In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court adopted the so-called *Birnbaum* rule which limits standing in Rule 10b–5 cases to those plaintiffs who actually purchased or sold securities, *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2nd Cir.1952), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), thereby limiting the "predicate act" to actual purchase or sale. *Blue Chip* itself dealt specifically with a potential purchaser who passed up an opportunity to purchase, holding that such a potential purchaser had no securities law cause of action. However, the *Blue Chip* Court referred several times to the analogous situation of a holder of securities who is fraudulently induced not to sell:

> [I]n the absence of the *Birnbaum* rule, it would be sufficient for a plaintiff to prove that he had failed to purchase *or*

---

**3.** We assume without deciding, for the sake of today's ruling only, that a private cause of action exists under all three alleged provisions of the 1933 and 1934 Acts. If this matter is not resolved as a result of the Supreme Court's ruling in *Lampf Pleva*, we will make a full scale inquiry into the issues of implied remedies.

**4.** 15 U.S.C. section 78i, for instance, provides that:

> No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation.

(Section relates to manipulation of securities prices). *See In Re Data Access Systems Securities Litigation*, 843 F.2d 1537 (3rd Cir.1988) (noting that "within three years" means "in no event more than three years after such violation.") *Id.* at 1550.

*sell stock* by reason of a defendant's violation of Rule 10b–5.

. . . .

In the absence of the *Birnbaum* doctrine, bystanders to the securities marketing process could await developments on the sidelines without risk, claiming that inaccuracies in disclosure caused *nonselling in a falling market.* . . .

(*Blue Chip*, 421 U.S. at 745–47, 95 S.Ct. at 1930–31, emphasis added).

■ Under the *Birnbaum* rule, then, once a purchaser owns the stock in question, only a fraudulent inducement resulting in actual sale will trigger liability under Rule 10b–5. Fraudulent statements which induce the holder of a security *not* to sell in a falling market are not actionable.[5] T. Hazen, *The Law of Securities Regulation, 2nd Ed.* § 13.3 (1990). *Baum v. Phillips, Appel & Walden, Inc.*, 648 F.Supp. 1518 (S.D.N.Y.1986), *aff'd*, 867 F.2d 776 (2nd Cir.1989).

We disagree with the reasoning of some post-*Birnbaum* courts which have held that a fraudulently induced failure to sell may trigger liability so long as "the plaintiffs signify to the defendant their present intention to sell their shares and are specifically induced thereafter by a fraudulent scheme to retain their shares." *Rich v. Touche Ross & Co.*, 415 F.Supp. 95 (S.D.N.Y.1976). We believe that such an "exception" to the *Blue Chip* holding is specifically precluded by the above-quoted *Blue Chip* language in which the inaction of the potential seller is specifically identified as *not* giving rise to liability.

Therefore, under the rule as set out in *Blue Chip*, the only transactions pleaded here which could possibly provide predicate acts for violations of the securities laws are the three original purchases of the trusts in 1986, the last of which occurred on December 16, 1986, more than three years prior to the filing of this action. Any subsequent activity on the part of the defendants to "hide" the fraudulent nature of the original purchases cannot give rise to such liability. Nor can the January 1989 letter in which Almonte falsely inflated the value of the bonds underlying the trust (allegedly causing plaintiff to hold the plummeting trusts under the incorrect perception that they were performing well) trigger violations of the securities laws. This is not to say that the post-purchase "cover-up" alleged here is useless to case at bar. The post-purchase acts alleged might lead to recovery under a common law fraud theory, or, assuming that the three-year federal statute of limitations is *not* adopted by the Supreme Court, they may be relied upon by plaintiff to excuse its otherwise late filing of the action.[6]

■ Since the only predicate act occurred more than three years prior to the filing of the action, the decision to apply either the federal or state limitations scheme will be determinative in the dispute as to the timeliness of this case. Under the federal rule, the action would be barred, as occurring three years prior to the filing, no tolling being applicable. Under the Puerto Rico rule, plaintiff's otherwise late filing may be excused by the doctrine of tolling for fraudulent concealment. *Maggio*, 824 F.2d at 128. The Second, Third, and Seventh Circuits have all recently adopted the federal borrowing scheme over the state borrowing plan. *Ceres Partners v. GEL Associates*, 918 F.2d 349 (2nd Cir.1990); *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385 (7th Cir.1990); *In Re Data Access Systems Securities Litigation*, 843 F.2d 1537 (3rd Cir.1988). The trend in this district, and the implication to be drawn from *Cook v. Avien Inc.*, 573 F.2d 685 (1st Cir. 1978) (application of Massachusetts rule), might lead us to apply Puerto Rico's rule. However, the strong recent trend in the other direction, and the imminent settling of the issue by the Supreme Court, sug-

---

**5.** What may not be actionable under the securities laws may still lead to liability under a common law fraud theory.

**6.** The automatic "sale" of the trusts at half their original value, as required by the trust purchase agreement, cannot give rise to liability. It was not the *sale* of the trusts which caused loss to plaintiffs. It was the *delay* in selling that caused loss.

gests that the prudent course is for us to wait until the issue is decided. Accordingly, the federal securities claim and the pendent common law claims against Almonte and Kidder are **stayed** until a decision is reached in *Lampf Pleva, supra.* The securities law claims against Paine Webber are **dismissed** in their entirety (as no acts by Paine Webber are alleged which are "predicate acts" within the above definition). The common law claims against Paine Webber are **stayed.** (We decline to dismiss the pendent state law claims against Paine Webber, since judicial economy may militate towards our retention and determination of the pendent state law claims against Paine Webber along with our disposition of the remainder of this case. We have the discretion to retain jurisdiction over a pendent state law claim even after dismissal of the federal claim based on considerations of "judicial economy, convenience, fairness and comity." *Carnegie–Mellon University v. Cohill,* 484 U.S. 343 n. 7, 108 S.Ct. 614 n. 7, 98 L.Ed.2d 720 (1988)). Counsel for plaintiff may reactivate the matter by motion to the court informing us of the outcome in *Lampf Pleva, supra.*

## IV. RICO Claims

Plaintiff loosely asserts a violation of subsections (a), (b), and (c) of 18 U.S.C. § 1962, the Racketeer Influenced and Corrupt Organizations statute (RICO). Subsection (a) makes it unlawful for any "person" who has received income from a pattern of racketeering activity to invest such income into any "enterprise" which is engaged in interstate commerce.[7] Subsection (b) makes it unlawful for any person through a pattern of racketeering to gain control of any interstate enterprise.[8] Sub-

section (c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

### A. The Coop as Enterprise, 18 U.S.C. §§ 1962(b) and (c)

■ Defendants are correct that there is no conceivable set of facts which might establish liability under subsection (b) against any of them. Plaintiff argues in detail in its joint opposition to the various motions to dismiss that the defendants, through their allegedly illegal mail and securities fraud, sought to "acquire or maintain" ... "control" of the Coop itself. Under such a scenario, the Coop would be the "enterprise" engaged in or affecting interstate commerce. We think it stretches the plain language of the statute too far to envision liability under this section where the "control" alleged is the mere fact that the plaintiff was induced to rely on misrepresentations of the defendant or defendants. Detrimental reliance, by definition, is one of the necessary elements for *any* fraud claim. Detrimental reliance means that the victimized party is "affected" by the perpetrator to the degree of acting on the fraudulent inducement. We think "acquire or maintain, directly or indirectly, any interest in or control of any enterprise" as set out in section 1962(b) requires allegations of "control" which go beyond the "control" evidenced by the victim's willingness to enter into a fraudulent transaction.

---

7. 18 U.S.C. section 1962(a) states in relevant part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition or

any interest in, or the establishment or operation or, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce....

8. 18 U.S.C. section 1962(b) states:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

None of the cases cited by plaintiff on this point support its plea for section 1962(b) liability on these facts. We do not deny that in some situations, the perpetrators of a broad fraudulent scheme might be said to actually "control" an enterprise, though they are committing the fraud from the outside rather than the inside. *Sutliff, Inc. v. Donovan Companies*, 727 F.2d 648 (7th Cir.1984). The mere allegations here, however, of the induced purchase and re-tention of three sets of trust units by Coop, an organization whose entire business con-sisted of making investments, cannot be said to approach the level of control re-quired by the statute. The defendants, in the light most flattering to plaintiff, did not "control" the Coop by fraudulently causing the Coop to make bad investment decisions.

■ Similarly, we reject the Coop's con-tention that it may be the "enterprise" for purposes of section 1962(c). Again, the statute's requirement that the implicated person "conduct or participate, directly or indirectly, in the conduct of such enter-prise's affairs through a pattern of racke-teering" means that the enterprise is the vehicle or tool used by the racketeering person to perform the pattern of illegal activity. We do not deny the possibility that the plaintiff in a RICO suit could conceivably also be the "enterprise." For instance, where a "person" infiltrates a legitimate organization and uses the ma-chinery of the organization to cheat the organization itself, the organization may later sue under RICO. *Sutliff, supra*. In *Sutliff*, the plaintiff corporation was oper-ated by a woman alleged by the corpora-tion in its complaint to have been mentally incompetent. The defendants took advan-tage of the situation to commit a whole series of frauds against the corporation. The *Sutliff* court stated that:

the defendants as having 'associated with' Sutliff [the plaintiff corporation] and conducted its [Sutliff's] affairs by

means of the fraud; and if, as these allegations imply, the defendants infil-trated Sutliff and used it as a tool to defraud it ... section 1962(c) was violat-ed.

*Sutliff,* 727 F.2d at 653.

In such a case, the basis for defining the plaintiff organization as the "enterprise" used for the racketeering activity for pur-poses of section 1962(c) is the organiza-tion's role as the instrument of the defrau-der, not its role as victim. In the case at bar, it is too strained to say that any one or all of the defendants "conduct[ed]" or "par-ticipated in the conduct of [the Coop's] af-fairs through a pattern of racketeering ac-tivity" in that they induced the Coop into relying on fraudulent assertions. We think that section 1962(c) liability, aimed at at-tacking the existence of criminal actors cre-ating or infiltrating and using enterprises for criminal schemes, is predicated on the illegal actor entering the sphere of opera-tions of the "enterprise." Merely *influ-encing* one or a few decisions of those acting within the operational sphere (in this case Almonte or the other defendants fraudulently inducing the Coop to buy and hold the trusts) is insufficient. Therefore, the Coop cannot be considered the "enter-prise" for purposes of section 1962(c).[9]

**B.  Kidder and Paine Webber as Joint "Enterprise", 18 U.S.C. § 1962(c)**

■ Another conceivably identifiable "enterprise" which we explore, but reject, is a union of Kidder and Paine Webber as individuals "associated in fact although not a legal entity." 18 U.S.C. § 1961. We reject this possibility because even a liberal view of the pleadings fails to support the proposition that Kidder and Paine Webber were associated in fact. The existence of the predicate acts by Almonte first at Kid-der and then at Paine Webber does not, by itself, create any link between Kidder and Paine Webber which would amount to an

---

**9.** Kidder, in its brief, states without legal sup-port that "RICO requires at a minimum proof of a *defendant* enterprise." This statement ignores the possibility of a legitimate enterprise, infest-ed by illegal actors, from using RICO to "purge" its own ranks and recover for the injuries

caused it by the threat from within. We see no support in the statute or case law to suggest that such a use of RICO by a plaintiff "enterprise" is prohibited. Under Kidder's theory, the suit in *Sutliff* should have been dismissed for failure to allege a "defendant" enterprise.

association-in-fact. As the Supreme Court explained "enterprise" in the criminal case of *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981):

> In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. 18 U.S.C. section 1961(1) (1976 ed., Supp. III). The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity;" it is an entity separate and apart from the pattern or activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

The only way in which we could identify Kidder and Paine Webber as one enterprise would be to associate them in fact through the series of predicate acts that Almonte committed first at one brokerage house and then the other. We would be allowing plaintiff to establish an enterprise merely by showing related predicate acts, a result which the above quoted language disallows. There is no reasonable reading of the facts as alleged with by which we could find that Kidder and Paine Webber worked together to commit predicate criminal acts as an "ongoing organization" nor that they "function[ed] as a continuing unit." *Turkette, supra.* No theory of the facts alleged supports a joint Kidder/Paine Webber enterprise.

## C. Kidder and Paine Webber, Separate Enterprises, 18 U.S.C. § 1962(c)

The corporate defendants, Kidder and Paine Webber, argue that they, as individual "enterprises" for purposes of section 1962(c), cannot be held liable, that only the "person" who is employed by or associated with an enterprise can be targeted. They argue that although a "person" can sometimes be a corporation, in the context of this statute, the enterprise and the person must be distinct entities. This position is exactly correct. The First Circuit case of *Schofield v. First Commodity Corp. of Boston,* 793 F.2d 28, 30 (1st Cir. 1986), is almost directly on point. There an investor claimed commodities fraud against a brokerage house for fraudulent acts committed by one of its brokers. The plaintiffs in *Schofield* argued that the "person" was the broker, and the brokerage house was the "enterprise". The *Schofield* plaintiffs argued that if the fraudulent activity represented a policy of the brokerage house, both the brokers *and* the brokerage house could be held liable. The First Circuit flatly rejected the argument. The court held that,

> [s]tripped to its essentials, section 1962(c) states that it is unlawful for any person associated with an enterprise to conduct that enterprise through racketeering. The enterprise is mentioned in the section only as the instrument of the person doing the racketeering, and there is no suggestion that the enterprise also may be liable, even if it is a wholly illegitimate operation.

*Schofield,* 793 F.2d at 30. Therefore, the only potential defendant under section 1962(c) is Almonte, as the "person" associated with the two "enterprises", Kidder and Paine Webber. *See also, Arzuaga–Collazo v. Oriental Federal Sav. Bank,* 913 F.2d 5 (1st Cir.1990), (following holding of *Schofield* ).

## D. Kidder and Almonte as Defendants, 18 U.S.C. § 1962(a)

Since section 1962(a) has no requirement of a "person" distinct from the

"enterprise", Kidder and Almonte are still potential defendants under that section. As the First Circuit explained in *Schofield:*

> The language in section 1962(a) does not require a relationship between the person and the enterprise as does section 1962(c), and so it does not require the involvement of two separate entities. Applied to the facts of this case, section 1962(a) would prohibit [the brokerage house], the person, from using ill-gotten gains in [the brokerage house], the enterprise.

*Schofield*, 793 F.2d at 31.

Applied to the case at bar, Kidder, the person, could be liable under section 1962(a) if it invested funds fraudulently obtained in a pattern of racketeering in Kidder, the enterprise. Almonte, the person, could be liable if he invested funds in Kidder, the enterprise, acquired through a pattern of racketeering.

### E.  Erroneous Labelling

■ Defendants urge us to dismiss the claim at least partially on the basis of the plaintiff's confused and sometimes erroneous allegations regarding who is and who is not an "enterprise". We agree with defendants that the complaint on this issue is less than exemplary. We disagree that a sanction of dismissal is warranted on this ground. Though plaintiffs may have incorrectly labelled the various "enterprise"/"person" relationships, plaintiff's erroneous labelling of "enterprise" and "person" is not fatal to its claim. While we are not obligated to "exercise imagination and conjure what plaintiff might have alleged, but did not," *Pinto v. Universidad de Puerto Rico*, 895 F.2d 18, 19 (1st Cir. 1990), it is not difficult for us, on the facts as alleged, to label the relevant actors for purposes of the statute. Since we face a motion to dismiss for failure to state a cause of action, we must construe the pleadings in the light most favorable to the non-moving party. Almonte is a potential RICO defendant under section 1962(c) as the "person" who allegedly used the "enterprises" of Kidder and/or Paine Webber to commit his criminal acts. Kidder and

Almonte are potential RICO defendants under section 1962(a) as the "person[s]" who invested illgotten gains in an enterprise, Kidder being the "enterprise" also. We go on now to determine whether these potential defendants have had allegations hurled against them sufficient to withstand this motion to dismiss.

### F.  12(b) and 9(b) Motions on RICO Claims

■ To recover in a civil suit under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, a plaintiff must prove that the defendants engaged in certain "prohibited activities," each of which requires the proof of a "pattern of racketeering activities" as a threshold issue. 18 U.S.C. § 1962. The definition of "racketeering activity" includes, *inter alia*, mail fraud (18 U.S.C. § 1341); wire fraud (18 U.S.C. § 1343); and fraud in the sale of securities. 18 U.S.C. § 1961(1). A "pattern" requires "at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5). The plaintiff must prove that he or she was "injured in his business or property by reason of a violation" of the statute. 18 U.S.C. § 1964(c). The statute can be used against traditional "mobster" enterprises, as well as "legitimate" businesses which are being misused for illegitimate ends. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

The language of the statute is not very helpful in providing courts with a practical yardstick with which to measure allegedly violative behavior. The development of a meaningful definition of the term "pattern" has been particularly elusive. In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court developed a test to determine whether a pattern exists for purposes of RICO. The Court held that the RICO plaintiff (or prosecutor in criminal actions) must show "continuity and relationship." In other words, the plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S.

at ——, 109 S.Ct. at 2900 (emphasis in original). Unfortunately, we might agree with the concurring opinion of Justice Scalia in *H.J. Inc.*, that the majority's directive to lower courts to look for "continuity plus relationship" is as "helpful to the conduct of [the lower courts'] affairs as 'life is a fountain'". *H.J. Inc.*, 492 U.S. at ——, 109 S.Ct. at 2906 (Scalia, J.). Fortunately, the issue has received substantial attention in our own Circuit Court even in the year since the *H.J. Inc.* decision came down. *Arzuaga–Collazo v. Oriental Federal Sav. Bank*, 913 F.2d 5 (1st Cir.1990); *U.S. v. Ruiz*, 905 F.2d 499 (1st Cir.1990); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786 (1st Cir.1990); *U.S. v. Boylan*, 898 F.2d 230 (1st Cir.1990); *Fleet Credit Corp. v. Sion*, 893 F.2d 441 (1st Cir.1990).

To begin our inquiry, we will identify possible predicate acts and identify them with the proper "person"-"enterprise" nexus. For the reasons stated above, we refuse to label the Coop itself as an "enterprise". We do not see, nor is it alleged, that Kidder and Paine Webber together formed an "enterprise". Therefore, defendant Almonte's actions, if predicate acts at all, occurred with two separate "enterprises", first Kidder and then Paine Webber. To recover, plaintiff must show a RICO cognizable pattern of racketeering activities against either the Almonte–Kidder axis or the Almonte–Paine Webber axis, or both. But since continuity of enterprise is an element of a RICO claim, the relevant time frame to search for a "pattern" is divided into the two separate periods in which the separate "enterprises" were used by Almonte. The plaintiff here must show a pattern of "at least two acts of racketeering activity" by Almonte at Kidder to recover for the losses sustained prior to the account transfer, and a pattern of at least two such acts by Almonte at Paine Webber for losses suffered after the stock transfer.

The only acts by Almonte while at Kidder alleged by plaintiff to form the basis for liability are the three induced sales of trusts, occurring between June 23, 1986 and December 16, 1986. Assuming for the purposes of discussion that these acts either constitute securities fraud or wire fraud, they fall within the purview of predicate acts. Although we would likely view the three sales all as one "act", thereby precluding the possibility that plaintiff could establish even the minimum two-acts-in-ten-years statutory requirement, we must view the pleadings most favorably to plaintiff. Under the most generous view, then, three predicate acts occurred.

While the statute demands *at least* two predicate acts as the very definition of "pattern", merely two predicate acts, without more, is insufficient. As stated by Senator McClellan, leading sponsor of the bill: "Proof of two acts of racketeering activity, without more, does not establish a pattern." 116 Cong.Rec. 18940 (1970). *Sedima, S.P.R.L.*, 473 U.S. at 527, 105 S.Ct. at 3289. Applying the Supreme Court test for "pattern" of relationship and continuity, we reach the following result. *H.J. Inc.*, 492 U.S. at ——, 109 S.Ct. at 2893. The three sales are undoubtedly related. They have the same purpose, result, participants, victim and method of commission. *H.J. Inc.*, 492 U.S. at ——, 109 S.Ct. at 2901.

The question of continuity is more complicated. In *H.J. Inc.*, the Court emphasized the duration of the criminal activity as being a paramount consideration in the analysis. *Id.*, 492 U.S. at ——, 109 S.Ct. at 2900. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned with long-term criminal conduct." *H.J. Inc.*, 492 U.S. at ——, 109 S.Ct. at 2892. The Court in *H.J. Inc.* was facing a six-year long period during which the defendants had bribed several members of a public utility commission. In *Fleet Credit* a pattern was established by "95 fraudulent mailings over a four and one-half year period." *Fleet*, 893 F.2d at 447. The *Fleet* court recognized that "[h]ad the number of acts alleged by Fleet been few or the period of time short,

the predicate acts would not have amounted to continued criminal activity." *Id.* at 447. In *U.S. v. Boylan,* the First Circuit, in reviewing a jury instruction, was satisfied that proof of a pattern existed where the jury had found that Boston police officers (the "persons") used the Boston Police Department (the "enterprise") to accept "bribes" from nightclub owners so that various licensing violations would be "overlooked". The scheme involved at least several nightclubs and continued at different locations for periods ranging from one to six years. *Boylan,* 898 F.2d at 251.

We cannot find that the three sales of trusts, all completed within a seven-month period, constitute an ongoing, continuous criminal "pattern of racketeering." Three alleged acts barely rises above the statutory minimum of two acts in ten years, which the cited legislative history and case law have identified as insufficient, without more, to trigger liability.[10] Therefore, the RICO claims under sections 1962(a) and (c) against both Kidder and Almonte for the role he played at Kidder cannot stand. No pattern of racketeering has been stated.

### G. Almonte and Paine Webber

At the outset, we recall that plaintiff alleges no section 1962(a) claim against either Paine Webber or Almonte while at Paine Webber. Therefore, the Almonte–Paine Webber axis is not implicated under section 1962(a). We already dismissed the section 1962(b) claim for reasons stated above. As to the section 1962(c) claim, Paine Webber, as the alleged "enterprise", cannot be liable. Therefore, we are concerned only with the potential liability of Almonte for any pattern of racketeering which may have been established during his tenure at Paine Webber.

It is here that we bring in defendant's Rule 9(b) claim. Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice,

intent, knowledge, and other condition of mind of a person may be averred generally."

The RICO predicate acts alleged against Almonte for the period in which he serviced the account from Paine Webber center around mail fraud. 18 U.S.C. § 1341. Mail fraud, punishable under 18 U.S.C. § 1341, is explicitly made a predicate offense for purposes of RICO by 18 U.S.C. § 1961(1). Essentially, plaintiff alleges that after its account was transferred from Kidder to Paine Webber in August of 1987, Almonte and Paine Webber sent the Coop monthly statements of the Coop's holdings which "omitted relevant information concerning the market values of the [trusts] or falsely stated that such market values were not available to Paine Webber which is believed to be false." According to plaintiff, in late 1988 or early 1989 the trusts began to drop in value, but the drop was unknown to plaintiff since it was "covered up" by Paine Webber and Almonte's omissions or false claims that the information regarding the trusts' values was unavailable. In addition to this general averment, plaintiff makes one very specific allegation of a misrepresentation of trust values by Paine Webber and Almonte. As set out in the factual summary above, plaintiff states that a letter dated January 18, 1989 sent from "Paine Webber and Almonte" to plaintiffs misstated the bid prices for Series 10 and Series 2 trusts. The January 18 letter stated that the bid prices for the per share value of the funds were $887.37 and $604.35, respectively, when in fact the actual value was less.

Even if we assume that the allegation regarding the January 18, 1989 letter is sufficiently pleaded to state one predicate act committed by Almonte in association with Paine Webber, the remaining predicate acts necessary to create a pattern are insufficiently pleaded. The First Circuit has held that "Rule 9(b) requires specificity

---

10. Presumably two acts alone could be sufficient where a long period of planning of the predicate criminal acts was necessary to complete them. Such a case, although involving a small number of predicate offenses, still might encompass an intricate and involved criminal organizational plan. There is no evidence of such a continued period of illegal scheming and planning. Almonte made a few phone calls and completed the complained-of purchases.

in the pleading of RICO mail and wire fraud." *New England Data Services, Inc. v. Becher*, 829 F.2d 286 (1st Cir.1987); *Hayduk v. Lanna*, 775 F.2d 441 (1st Cir. 1985), (Rule 9(b) general discussion). The *New England Data* court cited with approval trial courts which required RICO fraud to be pleaded with basic operative facts:

> In face of the difficulties the courts have had in interpreting the provisions of RICO and also in face of the treble damage liability which defendants are subject to, it is imperative that [the defendants], as well as the court, be placed on clear notice as to the elements constituting [plaintiff's] RICO allegations.

*Saine v. A.I.A., Inc.*, 582 F.Supp. 1299, 1305–06 (D.Colo.1984), cited with approval in *New England Data*, 829 F.2d at 290.

The First Circuit adopted the reasoning of a New York District Court which explained that "[a] complaint alleging RICO mail fraud must specify, *inter alia*, precisely what statements were made, when and by whom they were made, the content of such statements and the manner in which they were misleading." *Bosteve, Ltd. v. Marauszwski*, 642 F.Supp. 197, 198 (E.D.N.Y.1986), cited with approval in *New England Data*, 829 F.2d at 290.

In the case at bar, the allegations as to time, place, and content of the allegedly fraudulent communications, with the exception of the January 18th letter, are impermissibly vague. Plaintiff alleges that "commencing on August 28, 1987, and each month thereafter, [Almonte and Paine Webber] caused to be sent and delivered by the U.S. Postal Service according to the directions therein from Paine Webber, monthly statements of the Cooperative's account, which omitted relevant information concerning the market values of the Drexel Burnham Lambert Unit Trust Series 10 and 2, or falsely stated that such market values were not available to Paine Webber which is believed to be false...." Plaintiff's allegation regarding the admission of "relevant" information, at least from August 1987 until late 1988, is puzzling. In the opposition to the motion to dismiss, plaintiff insists that "[n]o significant reductions in the market price of the securities occurred between the time of their purchase (June–December of 1986) and until at least January 18, 1989." (Docket Document No. 30 at 18). By plaintiff's own admission, even if Paine Webber had supplied the true values of the trusts, at least through late 1988, it would have made absolutely no difference in any of the Coop's investment decisions. Only after the trusts began to lose value did the Coop's ignorance about the dropping value (caused allegedly by wilful omission or actual misstatement) result in loss to them, in that they failed to sell out of a falling market. If plaintiff has a theory as to how failure to give it full and accurate information on the value of the trusts was "mail fraud" for the period in which no actual change in value was occurring, they have failed to state it here. Defendants and the court are left to guess which of the monthly statements (if indeed there were monthly statements), from August 1987 until July of 1989 were fraudulent and how. It is exactly this type of confusion regarding fraud allegations that Rule 9(b) seeks to avoid.

This obfuscation has serious practical effects on the litigation. For instance, the statements in which "omissions" were made might lead to a totally different defense strategy from statements in which "misstatements" were made. Proof of a predicate act under the former requires a showing of a fiduciary duty to disclose, while proof of a predicate act under the latter does not. *United States v. Carpenter*, 791 F.2d 1024 (2nd Cir.1986), *aff'd*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (Supreme Court case addressing other issues). The exact number of legally sustainable alleged violations of the mail fraud statute may affect the court's determination as to the issue of "pattern of racketeering" since those violations form the predicate acts. Under the present pleading, there is no measured way for us to apply the Supreme Courts' "relationship and continuity" test. *H.J. Inc, supra.*

However, having found that the requirements of Rule 9(b) have not been satisfied,

"dismissal should not be *automatic....*" *New England Data*, 829 F.2d at 290 (emphasis in original). Where the general averments explain the basic scheme of fraud, make it likely that the mail was used, and that the specific information is in the exclusive control of the defendants, the court should decide whether limited discovery and amendment would be appropriate. *Id.*

Discovery on the limited issue of the alleged monthly communications between Almonte–Paine Webber and the Coop, followed by an amendment to the pleadings, would be appropriate here. Through that procedure, the defendants and the court will be able to assess whether the RICO claim asserted here is *bona fide.* We **order** plaintiffs to set out their repleadings in as much detail as possible, to identify the date and contents of, and ascribe authorship to, any communication which plaintiff considers to be fraudulent. We **order** plaintiff to put before the court a clear and concise statement of its theory as to why each individual communication from Paine Webber–Almonte constitutes a predicate act for purposes of the RICO pattern. We remind plaintiff that "the Supreme Court [has] held that to come within the compass of the mail fraud statute, the scheme to defraud must be intended to deprive another of money or property." *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir.1990), *citing to McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). We expect plaintiff to explain in what way the alleged fraud by Almonte while at Kidder played a part in any plan for Almonte to benefit at the Coop's expense. Finally, we caution plaintiff that an unwillingness to heed our warnings with regard to the specificity of pleadings may have serious consequences.

## V. *Conclusion*

1. The cause of action for securities law violations against Paine Webber is DISMISSED in its entirety for failure to state a cause of action.

2. The causes of action for securities law violations against Almonte and Kidder are STAYED pending a decision by the Supreme Court in *Lampf Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, —— U.S. ——, 111 S.Ct. 242, 112 L.Ed.2d 201 (1990). Either party, or the court *motu proprio*, may restore this matter once relevant action has occurred in the *Lampf Pleva* case.

3. The pendent common law fraud claims against all three defendants are STAYED along with and upon the same terms as the securities law causes of action.

4. All RICO-based claims against Kidder are DISMISSED in their entirety for failure to state facts upon which a "pattern" of racketeering could be proven.

5. The RICO claims pursuant to 18 U.S.C. § 1962(b) are DISMISSED as to all defendants for failure to state a cause of action.

6. The RICO claim pursuant to 18 U.S.C. § 1962(c) against Paine Webber is DISMISSED.

7. We find that the pleadings as to the RICO predicate acts of mail fraud against Almonte, pursuant to 18 U.S.C. § 1962(c), for the period during which Almonte serviced the plaintiff's account from Paine Webber are not sufficiently specific. Rule 9(b). Accordingly, we open discovery for thirty (30) days on the limited issue of the existence, nature, and contents of any allegedly fraudulent mail or wire communications between Almonte, Paine Webber and the Coop during the period in which Almonte serviced the Coop's account from Paine Webber. We order plaintiff to amend its complaint in order to comply with Rule 9(b). Plaintiff will file its amended complaint within no more than sixty (60) days. We reserve judgment as to whether plaintiff has stated a cause of action under RICO until after the amended complaint has been filed.

8. Defendant Almonte's request to open discovery and to treat plaintiff's opposition as a conversion to summary judgment is DENIED, without prejudice to a renewal of such a request following the amendment to the pleadings as required in paragraph six.

9. Defendant Kidder's motion to convert to summary judgment or to strike factual material which appears in plaintiff's opposition papers to the motions to dismiss, material which Kidder claims to be outside the pleadings, is GRANTED to the extent that in making its ruling today, the court was not obligated to go beyond the pleadings. Kidder's motion will be reconsidered both after the amendment to the pleadings, and after the ruling on the statute of limitations issues. If conversion of the current motion to summary judgment is appropriate at that time, the court will so advise all parties.

IT IS SO ORDERED.